## Armour & Company v. Bank of Lynch.

(Decided January 13, 1925.)

### Appeal from Harlan Circuit Cuort.

1.  Banks and Banking—Bank Permitting Agent to Deposit Paper of Principal Held Not Liable, where Remittances from Such Account Exceeded Paper so Deposited.—Bank which wrongfully credited to agent's personal account paper payable to principal and indorsed by agent in unauthorized manner held not liable to principal on default of agent, where remittances to principal from such account were in excess of amount of paper so deposited.

2. Principal and Agent—Agent May Not Indorse Commercial Paper Without Written Authority, and one Dealing with Agent does so at his Peril.—Agent cannot indorse principal's name on commercial paper without authority, and one dealing with him in absence of such authority on such basis does so at his peril.

3. Banks and Banking—Bank Crediting Agent's Personal Account with Paper, Payable to Principal, and Indorsed in Unauthorized Manner, is Liable to Principal.—Bank receiving deposits on agent's personal account of checks, payable to principal, and indorsed in unauthorized manner, is liable to principal for full value of the paper so received, but is not put on inquiry as to ownership of cash and checks payable to agent personally, unless possessed of actual notice of principal's right thereto.

4. Banks and Banking—Bank Permitting Payment of Overdrafts in Agent's Account by Deposits of Paper Belonging to Principal Held Not Liable to Principal.—That overdrafts on agent's personal account were largely paid by deposits of paper belonging to principal, and indorsed by agent in unauthorized manner, held not to render bank liable to principal, where remittance to bank from such account exceeded amount of paper deposited.

W. C. KIRK and LOW & BRYANT for appellant.

SAMPSON & SAMPSON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

Armour & Co. employed one Castle as salesman and collector in the territory of Lynch and Harlan, his salary being $50.00 per week and expenses. He began work in September, 1919, and continued until July, 1920, at which time he absconded, leaving a shortage due his employer of near $11,000.00.

The company had a branch office at Middlesboro to which Castle made his remittances, his collections running on an average of $5,000.00 a week. Some accounts were paid in cash, others by the customer's check payable to Castle or to cash; while the bulk of them seem to have been paid by the customers' checks payable to Armour & Co.

To facilitate the business, Armour & Co. furnished Castle with a stencil reading thus:

"Pay to the order of ........................................................................

Bank in exchange for bank draft payable to Armour & Company.

                                "ARMOUR & COMPANY,

                                By ........................................

                                        Salesman."

This stencil was to be used in endorsing checks payable to it, and he was authorized to fill out the blanks therein and sign same; this to be done only for the purpose of purchasing bank drafts payable to Armour & Co., which were to be remitted to it, but he was given no authority to make any other form of endorsement or otherwise to sign its name in any way.

Shortly after Castle entered upon the business, the cashier of the Bank of Lynch solicited him to open a personal checking account with that bank, which he did, and which he continued during his employment, carrying it in his own name, but also depositing the company's funds therein.

During that period he rarely used the stencil in his business with the bank, the entire amount of drafts purchased from it in this way not exceeding $6,165.25. Generally he endorsed the various checks received by him "Armour & Co.," "Castle," and deposited same to his own credit. He also deposited checks payable to himself and cash all in the same account. In making remittances to Armour & Co. he did not draw directly on this account but would draw on it in favor of the Bank of Harlan or some other bank and purchase from such institution drafts payable to Armour & Co. for remittance, and in this way apparently kept from Armour & Co. all knowledge of the manner in which he was conducting the business, though appellee claims that Armour & Co. was informed of it. During the time mentioned his account was largely overdrawn, at one time the overdraft reaching $3,000.00. The officers of the bank admonished and pleaded with him in reference to this, and he reduced it by making other deposits of a similar nature, and at one time gave his personal note for $786.40. By the first of June, 1920, this had been cleared up. He was doing business with several other banks and perhaps conducting his transactions in the same way with them. His accounts were audited and approved in December, but these transactions were not discovered.

Castle's family lived in Middlesboro and ran a small account with Armour & Co., and he remitted to it his personal checks for these amounts, but never gave his personal check direct to it for his customers' accounts until the — day of July, when he mailed two personal checks on the Bank of Lynch as a remittance.

Upon the receipt of these checks Armour & Co. called him at Harlan over the telephone to ascertain his reason for so doing, and he explained that this was a cash collection. However, it developed that there were no funds to meet them and these checks were protested. Thereupon the company sent an auditor to investigate his accounts, the result of the investigation being as above stated.

Armour & Co. then filed suit to recover from the bank the amount of Castle's shortage. The suit is based on the theory: First, that the bank had notice of plaintiff's ownership of the checks payable to it and deposited by Castle, and that when the bank accepted such deposits and permitted Castle to withdraw the funds that it besame personally liable to plaintiff for the amount thereof to the extent of the shortage. Second, that the bank permitted Castle from time to time to overdraw his account in various amounts, the aggregate of which was far in excess of the amount of the shortage; that these overdrafts were the personal debts of Castle and were liquidated by the deposit of customers' checks drawn in plaintiff's favor; that thus the bank was knowingly collecting its own debts with the checks owned by plaintiff, and thereby became liable to it for the amount so collected.

An issue was drawn in the pleadings as to these matters and also as to whether Armour & Co. had notice of the manner in which Castle was conducting the business. A jury trial resulted in a verdict for the defendant, and plaintiff has appealed.

Much evidence was introduced along the lines above indicated, Armour & Co. producing and identifying something over $11,000.00 in customers' checks payable to it and deposited in the manner above indicated. An expert accountant employed by the defendant examined the books of the bank and those of the other banks with which Castle was doing business during that period. He was introduced by plaintiff and his evidence is relied upon by both parties.

This witness made a careful examination of the withdrawals from Castle's account with the Bank of Lynch and found that there had been remitted to Armour & Co., through bank drafts purchased with checks drawn on this account, the sum of $37,212.35; this was based on the presumption that all checks deposited to Castle's credit should be construed as belonging to Armour & Co. unless it clearly appeared that they were payable to

someone else, his elaborate statement being epitomized in the following summary:

SUMMARY OF ACCOUNT OF A. C. CASTLE WITH
BANK OF LYNCH, LYNCH MINES, KY.

| | | |
|---|---:|---:|
| Total deposits of all sources | | $39,949.57 |
| Items deducted as being personal funds: | | |
| Checks C. F. Huff | $1,370.00 | |
| Checks J. N. Nuckels | 123.32 | |
| Checks R. E. Hicks | 219.92 | |
| Notes of A. C. Castle | 786.40 | |
| Miscellaneous Checks | 11.46 | |
| Sale of Bonds | 21.36 | |
| | | $2,537.46 |
| Mis. Checks to A. C. Castle | $107.00 | |
| Cash | 1,108.93 | |
| Checks payable to cash | 890.00 | |
| Checks payable to other than A. C. Castle or Armour & Co. | 317.72 | |
| | | $2,423.76 |
| | | $4,961.22 |
| Less items chargeable against A. C. Castle personal funds | | 1,176.09 |
| | | $3,785.13 |
| Balance to remitted to Armour & Co. | | 35,927.35 |
| Balance in Bank | | 237.09 |
| | | $39,949.57 |
| Amount remitted as shown by cashier's checks and drafts as remitted Armour & Co., from deposits of Bank of Lynch, either direct or with checks on Bank of Lynch, used for the purchase wholly or in part for their cashier's checks and drafts | | 37,212.35 |
| Amount remitted from funds which are credited to A. C. Castle's funds | | 1,285.00 |
| | | $35,927.35 |
| Total checks of A. C. Castle drawn on Harlan State Bank and First State Bank and deposited in Bank of Lynch | | 8,253.50 |

The items aggregating $2,537.46, *supra*, are admitted to have been Castle's funds, represented by salary checks and other matters of a personal nature. Adding to this the $237.09 balance in his favor still appearing on the account, and not claimed by the bank, but which has been attached in another suit, we have the sum of $2,775.05. Deducting this sum from the total deposits, $39,949.57, leaves a balance of $37,174.50. As it is shown that Armour & Co. has been paid $37,212.35, it would appear that it has received a sum in excess of the funds be-

longing to Armour & Co., even assuming that all the other items on deposit belonged to that company.

In addition to the above items admittedly belonging to Castle, the summary, *supra,* shows $2,423.76 of other items, consisting of either cash or checks not payable to Armour & Company. If these items belonged to Armour & Company, it does not appear that the bank had any notice thereof. Deducting this sum from the $37,174.12 leaves the sum of $34,750.36, or $2,455.99 less than it is shown that Armour & Co. actually received. In addition to this, some of the checks payable to Armour & Co. and deposited by Castle were returned unpaid and charged back to the account, though the total of these does not appear in the summary.

True, the bank carelessly permitted Castle to convert the property of Armour & Co. to his own use by crediting him with the proceeds of Armour & Co.'s property and permitting him to check it out, but it clearly appears that $4,961.22 of the amount so deposited either belonged to Castle individually, or was cash, or checks payable to "cash" or to Castle individually, with no indicia of Armour & Co.'s title, and when it is considered that of these funds Castle only drew out in his own behalf the sum of $1,176.09, it is difficult to see how appellant is entitled to recover anything from the bank.

We recognize to the fullest extent the rule that an agent cannot endorse the name of his principal on commercial paper without written authority, and that one who deals with him in the absence of such authority does so at his peril.

In this respect the bank was grossly negligent, and it thereby became liable to Armour & Co. for the full amount of all paper payable to that firm which it received through the invalid endorsements mentioned and misappropriated by Castle; but it was not put on inquiry as to cash and checks payable to himself deposited by Castle, unless it had actual notice that they were the property of Armour & Co. (Seitz Co. v. Bank of Murray, 204 Ky. 115.)

The overdrafts run by Castle were his personal debts to the bank. They were in part liquidated by depositing to his credit checks payable to Armour & Co. Technicaly such liquidation was the payment of those debts with Armour & Company's funds. However, it appears that these overdrafts arose chiefly in making

remittances to Armour & Co. and in checks payable to that firm and credited to this account, being returned unpaid and charged against the account. In this respect the notice to the bank of the ownership of the checks deposited to Castle's credit on the overdraft was the same as the notice it had in paying out similar proceeds on Castle's checks, and the same liability was created in both instances.

As Armour & Co. received more in remittances than the full amount of the checks drawn in its favor and deposited by Castle the same principle should apply to the liquidation of the overdrafts as applies to the payment of Castle's checks drawn on that account.

It must not be overlooked that there is no charge of collusion between the bank and Castle. It is not intimated that the bank had any information of his defalcation or that he was misappropriating his employer's funds. Its liability arose by reason of carelessly permitting him to convert the property of Armour & Co. to the uses indicated, but this does not extend to any fraudulent conduct of his of which it did not have notice. Perhaps he took advantage of this situation to collect and retain cash items or other funds, but it does not appear that the funds deposited in this bank were misappropriated, and the liability of the bank extends no further.

It is not deemed necessary to review the elaborate instructions given or those offered by the plaintiff and refused by the court, as for the reasons above indicated we do not feel that appellant has any just ground for complaint.

Perceiving no error, the judgment is affirmed.